IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHONA MAYFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-3412-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Shona Mayfield seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) formulating plaintiff's residual functional capacity, (2) finding that plaintiff's irritable bowel syndrome is not a severe impairment, and (3) finding plaintiff's testimony not credible. I find that the substantial evidence in the record as a whole supports the ALJ's finding the plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.*     *BACKGROUND*

On June 29, 2009, plaintiff applied for disability benefits alleging that she had been disabled since February 28, 1997. Plaintiff's disability stems from fibromyalgia, chronic fatigue, irritable bowel syndrome, nerve damage on her right side, and thyroid disease. Plaintiff's application was denied on August 27, 2009. On February 8, 2011, a hearing was held before an Administrative Law Judge. On March 6, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 14, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1974 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 177.25 | 1993 | $ 21,534.00 |
| 1975 | 406.07 | 1994 | 18,834.39 |
| 1976 | 73.43 | 1995 | 15,338.84 |
| 1977 | 259.35 | 1996 | 19,713.34 |
| 1978 | 1,617.94 | 1997 | 3,387.71 |
| 1979 | 0.00 | 1998 | 0.00 |
| 1980 | 0.00 | 1999 | 0.00 |
| 1981 | 0.00 | 2000 | 0.00 |
| 1982 | 0.00 | 2001 | 0.00 |
| 1983 | 5,107.20 | 2002 | 0.00 |
| 1984 | 14,968.45 | 2003 | 0.00 |
| 1985 | 5,367.06 | 2004 | 0.00 |
| 1986 | 10,326.00 | 2005 | 0.00 |
| 1987 | 13,695.41 | 2006 | 0.00 |
| 1988 | 18,394.91 | 2007 | 0.00 |
| 1989 | 18,394.91 | 2008 | 0.00 |

4

| 1990 | 20,747.05 | 2009 | 0.00 |
| 1991 | 19,483.49 | 2010 | 0.00 |
| 1992 | 19,449.78 | | |

(Tr. at 121).

## Disability Report - Adult

In an undated Disability Report, plaintiff reported that she is 5'6" tall and weighs 238 pounds (Tr. at 128-136). She stated that she is unable to work due to fibromyalgia, chronic fatigue, irritable bowel syndrome, nerve damage on her right side, and thyroid disease. She has trouble eating and going to the bathroom. "I vomit about once a week" and her spells sometimes last several days. She gets weak and sicker in the summer because the heat aggravates her condition.

Plaintiff reported that by 1997 she missed work on a weekly basis, and she stopped working on February 28, 1997, because she was missing work "all the time." Plaintiff completed her Bachelor's degree in 1982 and she completed secretarial school in 1981.

## Function Report - Adult

In a Function Report dated July 29, 2009, plaintiff reported that she has four different types of day: "good; moderate; bad & downright ugly!" (Tr. at 138-146). On a good day, her pain is off and on or if it is constant it is "low grade". She is able to cook, shop, do light housework, hang out with her friends or family, and she is out of bed most of the time. On a moderate day, she is in and out of bed most of the day. Any tasks done are done in stages as her pain level can worsen if she does not rest her side every few minutes. An example is that she can sit and fold laundry for three or four minutes and then take a five-minute break. She does not get much done on moderate days. On bad days, her pain level is very high. She spends all day in bed lying on heated, moist towels. She has uncontrollable vomiting, she

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 5 of 37

cannot hold down her medications, and she has "zero chance" of getting her nerve pain under control. This lasts for days. On "ugly" days, she is in bed all day, she makes trips to the doctor for pain and nausea shots, or she goes to the hospital[1] to get things back to normal. She can go back and forth between bad and ugly days for several days, usually two to five days but she has had this cycle for eight to 12 days before having a moderate or good day. Her spouse often has to take care of her.

Plaintiff feeds and waters her pets. Her pain keeps her up at night. Plaintiff reported that her husband gets food for her, helps her walk to the toilet, and exchanges hot moist towels during her "illness."

Plaintiff cooks complete meals on good days. She tries to do most of the cooking on moderate days but it takes longer. She does simple cleaning, folds laundry, washes a small amount of dishes, and picks things up. Plaintiff goes outside once or twice a day. She goes out on her porch to check on her dogs or to get fresh air. She also rides in a car, but does not drive because the nerve on her right side gets irritated and it can be a problem to get back under control. She shops for groceries, household necessities, clothes and shoes in stores, by mail, and by computer. She is able to take care of household finances with her husband.

Plaintiff's hobbies include scrap booking, crafting, keeping in touch with friends and family. She tries to make plans with her friends "as often as possible" but her plans often have to be canceled due to chronic ill health. She often talks on the phone to her best friend. Every two weeks she plays bingo with a friend. Every three to four months she goes to Branson to see a show, museum or some attraction with a friend. Occasionally she eats out with her family.

_____

[1]There are only two medical records from a hospital and those was due to muscle spasms and a spider bite.

6

Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, climb stairs, remember, complete tasks, concentrate and use her hands (Tr. at 143). Her condition does not affect her ability to sit, kneel, talk, hear, see, understand, follow instructions or get along with others (Tr. at 143). She can walk 1/8 to 1/4 mile before needing to rest for five minutes. She follows instructions "very well."

B.     SUMMARY OF MEDICAL RECORDS

Although plaintiff's alleged onset date is February 28, 1997, there are no medical records for 11 years after her alleged onset date.

On February 8, 2008, plaintiff saw Nancy J. Hayes, M.D., at Mountain Grove-Family Practice for a medication refill after being hospitalized[2] with 24-hour gastroenteritis (Tr. at 193). She requested medication for nausea. Dr. Hayes noted that plaintiff was in good spirits, well-groomed, and moving easily. She weighed 256 pounds. Her physical exam was normal. Dr. Hayes diagnosed fibromyalgia,[3] irritable bowel syndrome,[4] chronic flank pain (etiology uncertain), depression, and hypothyroidism.[5] She requested that plaintiff return in two months. Although the record says "prescriptions written," it does not indicate what prescriptions were written. However, the record states that plaintiff needed refills on

_____

[2]There are no records of this hospitalization in the file.

[3]Fibromyalgia is a common syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissues.

[4]Irritable bowel syndrome ("IBS") is a disorder that leads to abdominal pain and cramping, changes in bowel movements, and other symptoms. IBS is not the same as inflammatory bowel disease ("IBD"), which includes Crohn's disease and ulcerative colitis. In IBS, the structure of the bowel is not abnormal.

[5]Hypothyroidism is a condition in which the thyroid gland does not make enough thyroid hormone.

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 7 of 37

Tramadol,[6] Percocet,[7] and Soma[8] and that plaintiff requested a prescription for Promethazine.[9] She was also taking Cymbalta[10] and Synthroid[11] which she was able to obtain through a medication assistance program.

On April 8, 2008, plaintiff returned to see Dr. Hayes and reported that she had not had any further visits to the pain clinic for injections, but that her right flank still hurt (Tr. at 192). She reported difficulty getting housework done. She also reported having bad days associated with irritable bowel syndrome. Examination was normal except Dr. Hayes noted that plaintiff was slightly pale and her right flank was mildly tender. Dr. Hayes provided a prescription for Percocet (narcotic) with the understanding that plaintiff "get up and move and try to live as normal a life as possible."

On June 9, 2008, plaintiff returned to see Dr. Hayes (Tr. at 191). She reported having to come into the office for an injection due to a severe headache with nausea and vomiting. Plaintiff also relayed that her husband had stopped taking an anti-depressant because it made him hateful. Dr. Hayes wrote, "I wonder if that actually means that he would no longer put up with her shenanigans." Plaintiff was noted to be in good spirits, moving easily, well hydrated, and had good color. Dr. Hayes provided the same diagnoses and noted that plaintiff had

---

[6]Relieves moderate to moderately-severe pain.

[7]Narcotic pain reliever.

[8]Muscle relaxer.

[9]Used to treat allergies and nausea. Plaintiff requested the medication for nausea.

[10]Treats depression.

[11]Thyroid hormone.

limited finances[12] with no insurance. She made no medication changes.

On July 23, 2008, plaintiff reported to Texas County Memorial Hospital because of muscle spasms on the right side (Tr. at 200-202). She said she had seen Dr. Hayes the day before (although I have found no record for a July 22, 2008, appointment with Dr. Hayes) and was given Stadol[13] and Phenergan.[14] In the emergency room, she was given IV Stadol and Phenergan, and Dr. Karr applied a Lidoderm[15] patch and told plaintiff to return to Dr. Hayes. Her pain level at discharge was a 2 out of 10.

On August 28, 2008, plaintiff returned to see Dr. Hayes (Tr. at 190). She reported that she had contacted Dr. Ellis at the pain clinic and was going to "beg him for an intercostal injection[16]" because she believed that was the source of her pain. Plaintiff also reported continuing episodes of diarrhea and constipation as well as abdominal bloating. She reported going through Percocet, Tramadol, and Soma at the maximum allowable dosages. Dr. Hayes noted that plaintiff appeared slightly pale, but she was in good spirits and was able to move well. Her abdomen was protuberant and she was exquisitely tender to palpation in her right upper quadrant area. Dr. Hayes found that plaintiff may hold some fixed delusions about the

---

[12]Plaintiff did not indicate an inability to obtain treatment or medication; therefore, it is unclear why this was listed under "assessments." I note, however, that plaintiff smoked two packs of cigarettes per day during the entire time for which medical records were provided.

[13]Treats moderate to severe pain.

[14]Treats nausea.

[15]Treats nerve pain.

[16]An intercostal nerve block is an injection of a steroid or other medication around the intercostal nerves that are located under each rib. The steroid injected reduces the inflammation and/or swelling of tissue around the intercostal nerves, in between the ribs or in the chest wall. This may in turn reduce pain, and other symptoms caused by inflammation or irritation of the intercostal nerve and surrounding structures.

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 9 of 37

source of her pain.  She recommended that plaintiff confer with Dr. Ellis and she discussed with plaintiff the possibility of using Lidoderm patches and a TENS unit.[17]

On September 4, 2008, plaintiff reported to Ron Ellis, M.D., at St. John's Pain Management Center (Tr. at 194).  Plaintiff requested repeat trigger point injections into her right flank and rib margin area.  Palpation of her chest wall and flank produced tenderness.  Her gait was normal.  Dr. Ellis diagnosed inflammatory spondyloarthropathy (diseases of the joints) with enthesopathy (disorder of the muscular or tendinous attachment to bone) causing myofascial syndrome[18] with discrete muscular trigger points along the right lateral flank region, morbid obesity, tobacco abuse, gout,[19] ulcers, hypothyroidism, hiatal hernia,[20] and gastric reflux.[21]  He agreed to trigger point injections as soon as she could be placed on the schedule.

On September 11, 2008, Dr. Ellis performed trigger point injections on plaintiff (Tr. at 196).

_____

[17]TENS stands for transcutaneous electrical nerve stimulation.  Sticky electrodes are placed on the skin around the painful area. When the TENS unit is turned on, it delivers a light current through the electrodes to the skin and tissues just beneath it. TENS is thought to disrupt the pain cycle by delivering a different, non-painful sensation to the skin around the pain site, modulating the way pain sensations from that area are processed.  Depending on the frequency the TENS unit delivers, the electrical stimulation can also trigger the body to release endorphins which act as natural painkillers and help promote a feeling of well-being.

[18]Muscle pain and inflammation of the body's soft tissues.

[19]Gout is a kind of arthritis that occurs when uric acid builds up in blood and causes joint inflammation.

[20]Hiatal hernia is a condition in which part of the stomach sticks upward into the chest, through an opening in the diaphragm, the sheet of muscle that separates the chest from the abdomen.

[21]A condition in which the acidified liquid content of the stomach backs up into the esophagus.

On December 11, 2008, plaintiff returned to see Dr. Hayes for a medication refill (Tr. at 218-219). Dr. Hayes noted that plaintiff was smoking 2 packs of cigarettes per day and had for 30 years. She diagnosed unspecified essential hypertension, irritable bowel syndrome, and "unspecified myalgia[22] and myositis[23]."

On March 9, 2009, plaintiff returned to Dr. Hayes (Tr. at 224-225). She reported continued pain in her right upper quadrant, but said that the pain clinic had refused to give her any further injections. Dr. Hayes noted that it was not surprising since the injections did not significantly decrease her rate of chronic pain medication usage or her pain level. Dr. Hayes noted that plaintiff moved easily and ambulated without difficulty. Plaintiff said she continued to have alternating constipation and diarrhea and that she felt poorly. Dr. Hayes noted that plaintiff "describes excruciating pain but with normal affect and a steady pulse." Plaintiff had said she was thinking about quitting smoking "given that the price will go up in April." They spent "quite a bit of the visit mapping out strategies to quit smoking"; however, the record reflects that plaintiff never stopped smoking. Plaintiff claimed to have no appetite, but Dr. Hayes noted that plaintiff had gained 15 pounds. Examination revealed that plaintiff was mildly tender to palpation in one specific area in the right upper quadrant. Dr. Hayes diagnosed irritable bowel syndrome, hypothyroidism, unspecified myalgia and myositis, abdominal pain, and tobacco use disorder. Dr. Hayes recommended that plaintiff stay active and drop some weight. She discussed the importance of smoking cessation "in strongest terms" and offered to assist. "Have encouraged her to stay active and drop some of the weight." Plaintiff was told not to overuse her medication.

---

[22]Muscular pain.

[23]Myositis is inflammation of the skeletal muscles, which are also called the voluntary muscles, i.e., the muscles that can be consciously controlled to help move the body.

11

On May 11, 2009, plaintiff reported to Texas County Memorial Hospital because of a possible spider bite on the back of her leg (Tr. at 208-211). She was given Phenergan for nausea and discharged home.

On May 14, 2009, plaintiff returned to Dr. Hayes, reporting that she had gone to the emergency room because she thought she had been bitten on the leg by a spider or a tick (Tr. at 230-231). Dr. Hayes noted that plaintiff was "overly dramatic as usual" and that plaintiff had numerous varicose veins which had become thrombosed.[24] Dr. Hayes reassured plaintiff that this type of blood clot is painful but not dangerous. Because the antibiotic she had been prescribed in the emergency room was irritating her stomach, Dr. Hayes prescribed a new antibiotic.

The following day, on May 15, 2009, plaintiff saw Dr. Hayes without an appointment (Tr. at 237-238). Plaintiff was disheveled and was sobbing loudly, reporting abdominal pain from irritable bowel syndrome that was causing her to be unable to keep her medicine down. Plaintiff reported being awake for 24 hours because of the pain. She was hyperventilating at times. Plaintiff said it had been "a long time" since she had experienced a flare-up that bad. Examination revealed that her stomach was protuberant with active bowel sounds and mild diffuse tenderness. She was given IM Stadol (for pain) and Phenergan (for nausea) and was released in the care of her husband. "Did not try to do any detailed teaching as she was not ready to listen."

---

[24] 

12

On June 22, 2009, plaintiff returned to Dr. Hayes for routine follow-up to monitor her use of Percocet (narcotic) (Tr. at 245-246). She relayed that she had developed bursitis[25] in her right shoulder that was limiting her ability to sleep on her right side. Dr. Hayes indicated that plaintiff's right shoulder was tender to abduction. Dr. Hayes diagnosed bursitis in the shoulder and offered an injection of Depo-Medrol (steroid), but plaintiff declined, saying she was "not that miserable." Dr. Hays encouraged smoking cessation and exercise "as always."

The following week, on June 29, 2009, plaintiff filed her application for Social Security disability benefits.

On August 27, 2009, Lester Bland, Psy.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment was not severe (Tr. at 250-260). He found that plaintiff suffered from only mild limitations in maintaining social functioning and in maintaining concentration, persistence or pace, and no restriction in activities of daily living.

On September 17, 2009, plaintiff saw Dr. Hayes because of hip pain due to abscesses (Tr. at 330-337). Plaintiff continued to smoke two packs of cigarettes per day and weighed 250 pounds. Lab tests determined that plaintiff suffered from a staph infection but that it was easy to cure with antibiotics. Dr. Hayes noted that plaintiff believed the abscess came from where she had injections, but her injections had been given on the other side. Dr. Hayes questioned if plaintiff had been receiving injections from another source.

On December 14, 2009, plaintiff saw Ron Hiemstra, M.D., at Mountain Grove Medical Complex to establish care (Tr. at 327-328). She reported suffering from right-sided abdominal pain with back pain after undergoing a cholestectomy two years earlier (there are no records of this procedure in the file). She told the doctor that she was taking eight

---

[25]Bursitis is inflammation of the fluid-filled sac (bursa) that lies between a tendon and skin, or between a tendon and bone.

13

Tramadol, three Soma, and three to four Percocet daily. Her physical exam was completely normal except she had mild pain to palpation on the right side of her abdomen and multiple trigger points throughout her musculoskeletal system. Her upper extremities were normal. Dr. Hiemstra indicated he wanted to get copies of plaintiff's medical records. The rest of the record is essentially illegible.

On December 30, 2009, plaintiff returned to Dr. Hiemstra with reports of nasal congestion, cough, and right-sided pain (Tr. at 323-324). She weighed 248.2 pounds and was ill-appearing. Her physical exam was normal except for multiple trigger points. Her upper extremities were normal. She was diagnosed with acute bronchitis.

On January 12, 2010, plaintiff returned to Dr. Hiemstra for a follow up on chronic back and abdominal pain (Tr. at 317-318). She denied nausea, vomiting, or change in bowel pattern. She denied memory problems, anxiety, depression, or insomnia. She weighed 261 pounds. Examination revealed multiple positive trigger points. Exam of her neck, back and extremities was normal, including range of motion. Plaintiff relayed that she was averaging eight Tramadol (treats pain), three Carisoprodol (muscle relaxer, also called Soma), and three Oxycodone (narcotic) per day. Dr. Hiemstra told her to continue her medications at her present dose.

On February 2, 2010, plaintiff returned to Dr. Hiemstra for a recheck of chronic back and abdominal pain, fibromyalgia, irritable bowel syndrome, and hypothyroidism (Tr. at 311-312). She reported that the fibromyalgia, chronic back pain, and chronic abdominal pain had worsened with the cool and damp weather. She also reported that her irritable bowel syndrome had flared up. She denied anxiety, depression or insomnia. She weighed 243.6 pounds. Examination findings were the same and she was told to continue on her medications.

14

On February 22, 2010, plaintiff returned to Dr. Hiemstra for recheck of "chronic pain due to chronic back and abdominal pain and fibromyalgia which she states is stable." (Tr. at 305-306). Plaintiff denied nausea, vomiting, changes in bowel pattern, anxiety, depression, or insomnia. Plaintiff was in no acute distress but was observed to move "with obvious low back and muscle pain" and had multiple positive trigger points to palpation. Her diagnoses and medications stayed the same.

On March 11, 2010, plaintiff returned to Dr. Hiemstra (Tr. at 299-300). Plaintiff reported that her chronic pain and fibromyalgia were stable and under control and that her irritable bowel syndrome had improved. She denied anxiety, depression, insomnia, nausea, vomiting, or change in bowel pattern. Examination again revealed numerous positive trigger points to palpation. Her medications remained the same and Dr. Hiemstra referred plaintiff to a pain clinic.

On April 1, 2010, plaintiff returned to Dr. Hiemstra reporting a two-day history of flare-up of back pain to the point that the pain pills were not working and she was having nausea and vomiting (Tr. at 293-294). She requested a shot of Toradol (non-steroidal anti-inflammatory) and Promethazine (treats nausea) for the pain. Plaintiff reported that her irritable bowel syndrome was stable. She denied anxiety, depression, or insomnia. Dr. Hiemstra noted that plaintiff's gait was normal and she had normal range of motion in her neck and extremities. She had pain to palpation in the paraspinous muscles of her lumbosacroal region with decreased range of motion. Dr. Hiemstra gave plaintiff the shot of Toradol and Promethazine and told her to continue her pain medications.

On April 26, 2010, plaintiff returned to Dr. Hiemstra for a follow-up of her chronic pain syndrome and irritable bowel syndrome (Tr. at 287-288). She reported that her irritable bowel syndrome had improved since her last visit. She denied nausea, vomiting, change in

bowel pattern, anxiety, depression, or insomnia. Examination revealed multiple positive trigger points to palpation, pain to palpation of the paraspinous muscles of the lumbosacral region and decreased range of motion. She had normal range of motion in her extremities. She was told to continue her medications.

On both May 21, 2010, and June 18, 2010, plaintiff reported to Dr. Hiemstra for follow-up appointments (Tr. at 282-283, 285-286). On May 21, Dr. Hiemstra noted that plaintiff's upper extremities were normal. Examination findings remained the same, her irritable bowel syndrome was noted to be stable, and her medications were refilled.

On July 9, 2010, plaintiff returned to Dr. Hiemstra because of pain (Tr. at 279-280). She again reported that her irritable bowel syndrome was stable. Dr. Hiemstra referred plaintiff to the pain clinic.

On July 16, 2010, plaintiff returned to Dr. Hiemstra to discuss her medications (Tr. at 276-277). She reported that she had a bowel movement after not having one for two to three days and then suffered from diarrhea. However, Dr. Hiemstra noted that plaintiff's diarrhea had resolved. Plaintiff reported that her diarrhea had been associated with nausea and vomiting and severe right-sided abdominal pain. She requested Demerol (narcotic) for pain as she had been taking 18 Oxycodone (narcotic) a day and not receiving any relief. Dr. Hiemstra referred plaintiff to a gastroenterologist. No exam was performed this day.

On August 6, 2010, plaintiff saw Dr. Hiemstra for a recheck of her symptoms (Tr. at 272-274). Her exam was normal except for trigger points. Her upper extremities were normal. Plaintiff reported continuing to take six Tramadol, four Oxycodone, and three Carisoprodol daily, yet stated that she "has been doing well." Dr. Hiemstra noted that plaintiff had pain clinic and gastroenterology appointments later in the month and advised her to keep those appointments.

On August 30, 2010, and September 29, 2010, plaintiff returned to Dr. Hiemstra for refills of pain medications (Tr. at 266-271). During the August visit, plaintiff's exam was normal except for trigger points; her upper extremities were normal. He noted that her chronic pain, irritable bowel syndrome, and fibromyalgia were stable. She claimed she had an appointment at the pain clinic the following day. During the September visit she reported that her pain was stable; her chronic pain syndrome, irritable bowel syndrome and fibromyalgia were stable. Her exam was normal except trigger points. Her upper extremities were normal. She said that she had gone to the pain clinic but could not urinate so her appointment needed to be rescheduled but had not been yet. Dr. Hiemstra instructed her to go back to the pain clinic.

On October 22, 2010, Dr. Hiemstra wrote a letter to plaintiff terminating the doctor-patient relationship because of non-compliance (Tr. at 265).

There are no medical records between plaintiff's September 29, 2010, visit with Dr. Hiemstra and her February 8, 2011, administrative hearing.

## C.   *SUMMARY OF TESTIMONY*

During the February 8, 2011, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

### 1.   **Plaintiff's testimony.**

Plaintiff has lived in Mountain Grove with her husband for the past ten years (Tr. at 29). Her husband is employed, but plaintiff does not have medical insurance or Medicaid coverage (Tr. at 29-30). Plaintiff was 52 years of age at the time of the hearing (Tr. at 30). She graduated from high school and has a Bachelor of Science degree in Education (Tr. at 30).

Plaintiff worked as a social worker for the Missouri Department of Social Services Division of Aging until 1997 (Tr. at 30). She stopped working due to her health (Tr. at 30).

17

Plaintiff has irritable bowel syndrome which causes her difficulty every day (Tr. at 30-31). Whenever anything moves through her digestive tract, it causes severe pain in her side (Tr. at 31). Having a bowel movement or going to the bathroom repeatedly usually causes vomiting, and she suffers from cramping when she has a bowel movement (Tr. at 31). On a bad day, plaintiff has to use the bathroom four to six times per day (Tr. at 31). It comes on very suddenly, giving her very little warning (Tr. at 32). She has bad days about three days per week (Tr. at 32).

The pain in plaintiff's side is constant (Tr. at 32). This results in problems using her right arm (Tr. at 32).

Plaintiff has fibromyalgia which causes pain that comes and goes and is more severe in cold weather (Tr. at 32). She suffers from fibromyalgia pain three to four times a week (Tr. at 33).

Plaintiff is unable to stand for more than 30 minutes due to pain (Tr. at 33). She can comfortably lift less than five pounds, and lifting any more than that strains her right side and causes pain (Tr. at 33).

Plaintiff uses medication, hot packs, hot baths, and lying down to help relieve her pain (Tr. at 33). She lies down four to five times per day for an hour at a time to "all day" (Tr. at 34). Due to pain plaintiff has trouble sleeping and usually only gets four to five hours of sleep per night (Tr. at 34). Plaintiff is fatigued during the day, and her memory is impaired as a result of her sleeping difficulties (Tr. at 34).

Plaintiff does not have a driver's license because she does not consider herself safe to drive due to the medication she is taking (Tr. at 35). Her husband drove her to the hearing, and it took an hour and ten minutes (Tr. at 35). Plaintiff had to stop once during the trip to go to the bathroom (Tr. at 35).

18

Plaintiff prepares meals about three times a week (Tr. at 35). She does not do laundry, she does not vacuum, she does not do gardening or yard work -- her husband does those things (Tr. at 36). Plaintiff goes to the grocery store about once a month (Tr. at 36). Plaintiff reads a couple times per week but only for "short bursts" (which she defined as about 30 minutes) because holding the book hurts her side (Tr. at 36). Plaintiff plays bingo about once every three months playing four cards, and a bingo session lasts about three to four hours (Tr. at 37). Plaintiff does not scrap book -- she stopped doing that about ten years ago (Tr. at 37-38).

**2.      Vocational expert testimony.**

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. The vocational expert testified that plaintiff's past relevant work (case worker) was sedentary (Tr. at 38).

The first hypothetical involved a person who suffered the limitations described by plaintiff in her testimony (Tr. at 38). The vocational expert testified that such a person could not work (Tr. at 38).

The second hypothetical involved a person who could stand or walk six hours per day and for two hours at a time; sit for six hours a day and for two hours at a time; lift 20 pounds occasionally and 10 pounds frequently; and could occasionally bend, stoop, crouch, squat, kneel, and crawl (Tr. at 39). The vocational expert testified that such a person could work as a case worker and the person could also be a small products assembler with over 655,000 positions in the country and about 20,000 in the State of Missouri, or an office helper, with about 89,000 jobs in the country and about 1,300 in Missouri (Tr. at 39).

The third hypothetical was the same as the second but the person could only occasionally reach with his dominant right arm (Tr. at 40). The vocational expert testified that

the person could still perform plaintiff's past relevant work as a social worker, but the person could not be a small products assembler or an office helper (Tr. at 40).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge David Fromme entered his opinion on March 6, 2011 (Tr. at 12-20).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

Step two.  Plaintiff suffers from the following severe impairments: obesity, fibromyalgia, osteoarthritis, myofascial syndrome, and shoulder bursitis (Tr. at 14).  Her irritable bowel syndrome, history of gout, history of hiatal hernia, history of gastroesophageal reflux disease and her mental impairment are not severe (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity to perform light work except she is limited to sitting for two hours at a time; standing and walking for two hours at a time; and may only occasionally bend, stoop, crouch, squat, kneel and crawl (Tr. at 15).  Plaintiff's subjective complaints of disabling symptoms are not entirely credible (Tr. at 15-17).  With this residual functional capacity, plaintiff can perform her past relevant work as a case worker (Tr. at 18).

Step five.  In the alternative, the ALJ found that plaintiff is capable of working as an officer helper or a small products assembler, both available in significant numbers in the regional and national economy (Tr. at 19).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.      CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

21

minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> At the hearing, the claimant testified that she was employed as a social worker in the past, but stopped working primarily because of irritable bowel syndrome with vomiting, cramping and a need to use a restroom 4-6 times a day. She added that she has bowel problems approximately 3 days per week and that they "come on suddenly." The claimant testified that she also has fibromyalgia with constant right side pain and difficulty using the right arm. She added that she intermittently has pain "all over" and that it is aggravated by cold weather. She stated that she is limited to standing for 30 minutes and is limited to lifting/carrying less than 5 pounds. She stated that she takes medication, uses heat and lies down to relieve pain. She added that she must lie down 4-5 times a day for approximately 1 hour and sometimes must lie down "all day." The claimant stated that her sleep is disrupted by pain and that during the day fatigue interferes with memory. She testified that she does not drive any longer because she is "on a lot of medication." However, she acknowledged that she can prepare meals, shop for groceries, spend time reading and play bingo.

> The medical evidence shows that Nancy Hayes, M.D., stated in August 2008 that the claimant was complaining of side pain and of alternating diarrhea/constipation with abdominal bloating. The doctor noted that the claimant stated that she intended to visit a pain management specialist and "beg him for an intercostal injection" and that she was "going through" Percocet, tramadol and Soma at the maximum allowable doses daily. However, she further noted that the claimant was in good spirits and moving well and reported that there was no abnormality on examination other than tenderness to palpation in the right upper quadrant area. Dr Hayes's assessment included severe irritable bowel syndrome, fibromyalgia, intercostal pain and "continued smoker." She stated that the claimant weighed 252 pounds. In June 2008, Dr. Hayes had noted that the claimant was complaining of side pain, but displayed no abnormality on examination. She added that the claimant told her that her husband had recently stopped taking an anti-depressant medication because he became "hateful" on the drug. The doctor stated that she wondered if this "actually mean[t] that he would no longer put up with [the claimant's] shenanigans." At that time, she diagnosed fibromyalgia, irritable bowel syndrome, depression, obesity, smoking and side pain.

> Ronald Ellis, M.D., the pain management specialist who treated the claimant, noted in September 2008 that he and a nurse practitioner in his office had performed intercostal blocks and trigger point injections in the past, which the claimant had reported relieved her pain for several months. Dr. Ellis added that "unfortunately" the claimant was continuing to smoke and had not really lost any weight, indicating that he had suggested that smoking cessation and weight loss would help her. His diagnoses were inflammatory spondylopathy with enthesopathy, myofascial syndrome and right anterolateral chest wall/abdominal pain. He performed a trigger point injection at that time.

22

Dr. Hayes stated in March 2009 that the claimant had told her that pain clinic personnel had declined to perform further injections. She added that this was not surprising in light of the fact that the injections did not significantly reduce the claimant's rate of chronic pain medication usage. The doctor noted that the claimant was "seriously thinking about stopping smoking" but only because the price of cigarettes was about to go up. She further noted that the claimant moved easily and ambulated without difficulty and that, although she described excruciating pain, she had a normal affect and steady pulse. She added that the claimant reported that her appetite was poor, but that she had gained 15 pounds. The doctor's diagnoses at that time included irritable bowel syndrome, personality disorder, abdominal pain and tobacco use disorder. Dr. Hayes's records show that the claimant also had a diagnosis of hypothyroidism, but there is no indication that the condition is not controlled with medication. In May 2009, the doctor saw the claimant for a possible spider bite and noted that her presentation was "overly dramatic as usual." In June 2009, Dr. Hayes stated that the claimant was complaining of bursitis of the right shoulder. On examination, she found tenderness to abduction.

Lester Bland, Psy.D., a State agency non-examining medical consultant who reviewed the records relating to the claimant's mental health, stated on August 29, 2009, that the claimant had an affective disorder and a personality disorder. However, he opined that the impairments were not severe. He noted that the claimant alleged no functional limitations related to mental disorders and that she was able to do normal daily activities and required no treatment for mental illness.

On October 22, 2010, Ron Hiemstra, M.D., advised the claimant that he was withdrawing as her physician because she had not been compliant with her treatment plan.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In completing a Social Security Administration questionnaire as part of the application for benefits, the claimant stated that she was able to feed and water pets, prepare meals, do some house-cleaning, wash dishes, fold laundry, leave her residence once or twice a day, ride in a car, go shopping (for groceries, household supplies and clothing), manage the family finances with her husband, spend time "scrap-booking" and "crafting," socialize with friends, go out to bingo games and visit Branson, Missouri, to "see a show" or visit a museum or other attraction. She further stated that she was able to complete tasks and follow both written and verbal instructions "very well." These statements show that she engages in a generally normal range of daily activities and are inconsistent with her allegation of disability. Additionally, these statements contradict the claimant's hearing testimony because, when questioned at the hearing, she denied being able to perform many of the activities she herself listed on the questionnaire.

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 23 of 37

The medical records, moreover, do not support the claimant's allegation that she is disabled. She requires relatively little medical treatment and Dr. Hayes stated that she was "overly dramatic" in describing her symptoms, Dr. Ellis indicated that she had not stopped smoking and lost weight as he advised and Dr. Hiemstra declined to continue treating her because she was non-compliant with his recommendations. The claimant alleges disability due to irritable bowel syndrome with related need to use a restroom many times each day, but the evidence does not document such severe symptomatology. The claimant also states that she cannot work due to side pain; however, Dr. Hayes noted that her complaints of excruciating pain were accompanied by a normal affect and steady pulse, suggesting that her description of the pain was exaggerated, and Dr. Ellis, the pain management specialist, apparently refused to treat her further for the condition.

As for opinion evidence, the Administrative Law Judge notes that no physician who examined/treated the claimant opined that she is unable to work.

(Tr. at 15-17).

## 1.   PRIOR WORK RECORD

Although plaintiff has a fairly consistent work record during the decade after she graduated from college, she went 12 1/2 years after her alleged onset date before she applied for disability benefits, and there are no medical records for that time. This suggests that perhaps plaintiff stopped working for other reasons and spent a long period of time out of the work force due to something other than her impairments.

## 2.   DAILY ACTIVITIES

Plaintiff reported that she cooks, folds laundry, washes dishes, picks things up, shops, does scrap booking, does crafts, plays bingo every two weeks[26] (which, she testified, takes three to four hours and requires significant concentration since she plays four cards at a time), travels to Branson, attends shows, goes to museums, and eats at restaurants. The ALJ properly relied on these daily activities, and also properly relied on the fact that plaintiff contradicted herself during the hearing in that she denied performing activities during the hearing, but

---

[26]In her administrative reports she said she plays bingo every two weeks. During her administrative hearing, she changed the frequency to every three months.

24

reported in her administrative reports that she does those things. For example, on July 29, 2009, plaintiff reported that she does scrap booking, but during the administrative hearing on February 8, 2011, she said she had not done scrap booking for the past ten years. Plaintiff testified that her husband often has to take care of her -- she even reported that he has to help her to the toilet and he has to get food for her. However, plaintiff's husband works which leaves a significant amount of time when she would necessarily be fending for herself.

## 3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that her irritable bowel syndrome causes cramping and vomiting at least three times per week. In her Disability Report she said she vomits once a week. However, her medical records reflect that on May 15, 2009, plaintiff was seen for vomiting from irritable bowel syndrome and said that it had been "a long time" since her symptoms were that bad. Additionally, during almost every visit with Dr. Hiemstra plaintiff denied nausea and vomiting -- January 20, 2010; February 22, 2010; March 11, 2010; April 26, 2010; July 16, 2010 -- and on almost every visit while she was being treated by Dr. Hiemstra plaintiff reported that her irritable bowel syndrome was stable -- March 11, 2010; April 1, 2010; April 26, 2010; May 21, 2010; June 18, 2010; July 9, 2010; September 29, 2010. Plaintiff only reporting vomiting three times in all the medical records before me: once on June 9, 2008, when she reported to Dr. Hayes with a headache that was causing vomiting; once on April 1, 2010, when she reported to Dr. Hiemstra with back pain that was causing vomiting; and once on July 12, 2010, when she reported to Dr. Hiemstra that she had diarrhea accompanied by vomiting, but he noted that even the diarrhea had resolved by the time she came to see him.

Plaintiff testified that her right flank pain interferes with her ability to use her right arm. However, on December 14, 2009, Dr. Hiemstra found plaintiff's upper extremities were normal. On December 30, 2009, her upper extremities were normal. On January 20, 2010,

her upper extremities were normal. On April 1, 2010, her upper extremities were normal. On April 26, 2010, her upper extremities were normal. On May 21, 2010, her upper extremities were normal. On August 6, 2010, her upper extremities were normal. On August 30, 2010, her upper extremities were normal. On September 29, 2010, her upper extremities were normal. The only mention of plaintiff's shoulder in the medical records was from June 22, 2009, when plaintiff told Dr. Hayes she believed she had bursitis in her shoulder. On that visit, Dr. Hayes offered plaintiff a steroid injection which she declined, saying she was "not that miserable."

Plaintiff testified that she suffers from fibromyalgia pain three to four times a week. However, on only one occasion in these records did she complain of pain associated with fibromyalgia -- on February 2, 2010, she told Dr. Hiemstra that her fibromyalgia had worsened with the cool weather. I note here that in plaintiff's Disability Report she indicated that the heat aggravates her condition. She reported that her fibromyalgia was stable on February 22, 2010; March 11, 2010; August 30, 1010; and September 29, 2010.

Plaintiff testified that she has trouble sleeping, and this causes daytime fatigue and impaired memory. However, plaintiff never complained to her doctors of trouble sleeping except on the one occasion when she complained of shoulder pain, she said it interfered with her ability to sleep on that side. Plaintiff specifically denied insomnia on January 20, 2010; February 2, 2010; February 22, 2010; March 11, 2010; April 1, 2010; and April 26, 2010. Plaintiff never mentioned fatigue or memory problems to any of her doctors.

Finally, plaintiff testified that her symptoms require her to lie down four to five times per day from an hour at a time to "all day." There are no medical records wherein plaintiff mentions a need to lie down during the day at all, much less to the extent described in her testimony.

26

4.    *PRECIPITATING AND AGGRAVATING FACTORS*

There is little if any evidence of precipitating or aggravating factors.

5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The evidence establishes that plaintiff was on the same medication at the same dosages pretty much during the entire duration of the medical records indicating that her doctors believed her medicine was adequately controlling her symptoms.  Dr. Hiemstra directed plaintiff to go to a pain clinic on multiple occasions, but she did not do that.  Plaintiff never complained of side effects of her medication.  During the entire time she was treated by Dr. Hiemstra, plaintiff's exams were normal except for positive trigger points.  On February 22, 2010, plaintiff reported that her pain was stable.  On March 11, 2010, plaintiff reported that her pain was stable and under control.  Her condition was listed as stable on May 21, 2010; June 18, 2010; and July 9, 2010.  Plaintiff said she was doing well on August 6, 2010.  Her symptoms were stable on August 30, 2010.  Plaintiff said her pain was stable on September 29, 2010.  Clearly plaintiff's medication was controlling her symptoms.  In fact, if her symptoms were not well controlled by her medication, it is reasonable to assume she would have gone to the pain clinic as directed by Dr. Hiemstra.

6.    *FUNCTIONAL RESTRICTIONS*

There is no question that plaintiff was never placed on functional restrictions.  Instead, the record reflects repeated admonitions by her doctors to stay active and exercise.

B.    *CREDIBILITY CONCLUSION*

In addition to the above <u>Polaski</u> factors, I note that there are no medical records for the first 11 years of plaintiff's period of alleged disability.  There are no medical records between the time she last saw Dr. Hiemstra in September 2010 through the date of her administrative hearing on February 8, 2011.  Plaintiff was repeatedly told by her doctors to stop smoking;

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 27 of 37

however, there is no evidence that she ever attempted that. Plaintiff was repeatedly told to stay active and exercise. She was repeatedly told to lose weight; however, she never lost any significant amount of weight. Plaintiff told Dr. Hayes that she had no appetite, but Dr. Hayes noted that plaintiff had actually gained 15 pounds. Plaintiff described "excruciating pain" to Dr. Hayes who noted that plaintiff simultaneously had a normal affect, a steady pulse, moved easily, ambulated without difficulty, and had a normal exam except for only mild tenderness. On the occasion when plaintiff saw Dr. Hayes without an appointment, carrying on and sobbing in the office, her exam was normal except for mild diffuse tenderness. Plaintiff's exams with Dr. Hiemstra were consistently normal except for some positive trigger points.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's complaints of disabling symptoms is not credible.

## VII.  NON-SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in finding that her irritable bowel syndrome was not severe. Plaintiff points out that she "reported to more than one physician that she was suffering from alternating episodes of diarrhea and constipation" citing to pages 190, 224-225 and 276-277 of the transcript. Those visits are the following: On August 28, 2008, plaintiff told Dr. Hayes that she had had constipation and diarrhea; on March 9, 2009, she told Dr. Hayes that she had alternating constipation and diarrhea; and on July 16, 2010, she told Dr. Hiemstra that she had had a bowel movement after not having had one for two to three days and then she suffered from diarrhea, yet he noted that her diarrhea had resolved by the time she came to see him. Plaintiff also points out that Dr. Hiemstra referred plaintiff to a gastroenterologist.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities

without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)    Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe.  Caviness v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001).  While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities.  Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007).  To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The evidence plaintiff cites does not establish a severe impairment. Three bouts of diarrhea in a two-year period does not interfere more than minimally with basic work activities. Further, although Dr. Hiemstra referred plaintiff to a gastroenterologist rather than give her the Demerol she requested, there is no evidence that plaintiff made any effort to go see a gastroenterologist. This suggests she did not consider her symptoms that bad.

Plaintiff testified that she has irritable bowel syndrome which causes her difficulty every day. Whenever anything moves through her digestive tract, it causes severe pain in her side. Having a bowel movement or going to the bathroom repeatedly usually causes vomiting, and she suffers from cramping when she has a bowel movement. On a bad day, plaintiff has to use the bathroom four to six times per day. It comes on very suddenly, giving her very little warning. She has bad days about three days per week.

<u>Whenever anything moves through her digestive tract, it causes severe pain in her side</u>. The record reflects that plaintiff complained of right-sided pain on December 14, 2009, during a visit with Dr. Hiemstra. Her exam was completely normal except "mild pain to palpation" on the right side of her abdomen. Plaintiff next complained of right-sided pain two weeks later when she saw Dr. Hiemstra for what was diagnosed as bronchitis. Her physical exam was normal. She next complained of severe right-sided pain on July 16, 2010 -- six and a half months later -- and asked for Demerol, a narcotic. Dr. Hiemstra did not give her the Demerol, he told her to go see a gastroenterologist. There is no evidence that plaintiff ever did that. This record does not support plaintiff's testimony that she suffers from severe pain in her side whenever anything moves through her digestive tract.

<u>Having a bowel movement or going to the bathroom repeatedly usually causes vomiting, and she suffers from cramping when she has a bowel movement</u>. Plaintiff reported vomiting on three occasions when she saw a doctor, and on only one of those occasions was

vomiting associated with irritable bowel syndrome. On June 9, 2009, plaintiff told Dr. Hayes she had a headache that was causing vomiting. On April 1, 2010, she told Dr. Hiemstra that she was experiencing back pain that was causing vomiting. On that date, she reported that her irritable bowel syndrome was stable. Finally, on July 16, 2010, plaintiff told Dr. Hiemstra that she had diarrhea associated with nausea and vomiting and she requested Demerol. He did not give her the Demerol, he gave her a referral to a gastroenterologist whom she apparently never saw. Plaintiff specifically denied any vomiting during doctor visits on January 12, 2010; February 22, 2010; March 11, 2010; and April 26, 2010. There are no records at all wherein plaintiff mentions cramping as a symptom. The record does not support plaintiff's testimony that bowel movements or frequently going to the bathroom causes vomiting or that having a bowel movement causes cramping.

On a bad day, plaintiff has to use the bathroom four to six times per day. It comes on very suddenly, giving her very little warning. She has bad days about three days per week. There is no evidence that plaintiff ever complained of having to use the bathroom frequently (other than the discussion above regarding diarrhea). Plaintiff did, however, describe further in her administrative paperwork exactly what she experiences during a "bad day." On bad days, her pain level is very high. She spends all day in bed lying on heated, moist towels. She has uncontrollable vomiting, she cannot hold down her medications, and she has "zero chance" of getting her nerve pain under control. This lasts for days.

On only one day did plaintiff complain of what she called a bad day with irritable bowel syndrome. On April 8, 2008, plaintiff reported that "her irritable bowel syndrome has days that are especially bad when she is nauseated and having diarrhea." Dr. Hayes gave plaintiff a prescription for Percocet which is a narcotic pain reliever. It is reasonable to think that this was prescribed for the right flank pain of which plaintiff complained rather than due

31

to nausea and diarrhea. In any event, it was prescribed "with the understanding that with the pain medication she will get up and move and try to live as normal a life as possible." It appears that Dr. Hayes did not believe that plaintiff's irritable bowel syndrome (or right flank pain) would significantly limit plaintiff's physical or mental ability to perform basic work activities.

The medical records do not reflect any complaints of plaintiff having a sudden and frequent need to use the bathroom much less to the extent of three times per week. In addition, such symptoms would be inconsistent with plaintiff's daily activities, which are described in detail above.

The only evidence that plaintiff's irritable bowel syndrome significantly limits her ability to perform basic work activities came from plaintiff's own statements. They are not supported by any of the medical records, and they are not credible. In fact, the medical records support the ALJ's finding that plaintiff's irritable bowel syndrome is not a severe impairment.

On May 15, 2009, plaintiff saw Dr. Hayes without an appointment, sobbing and complaining of abdominal pain associated with irritable bowel syndrome. She stated during this visit that it had been a "long time" since she had had such a flare up, and the day before when she saw Dr. Hayes she did not mention any symptoms of irritable bowel syndrome. The rest of the records establish that her condition was regularly stable.

On January 20, 2010, plaintiff denied nausea, vomiting, change in bowel pattern. On February 22, 2010, she denied nausea, vomiting, and change in bowel pattern. On March 11, 2010, she said her irritable bowel syndrome was improved and she denied nausea, vomiting and changes in bowel patterns. On April 1, 2010, she said her irritable bowel syndrome was stable. On April 26, 2010, she said her irritable bowel syndrome was improved. She denied

32

nausea, vomiting, and changes in bowel pattern. On May 21, 2010, she said her irritable bowel syndrome was stable. On June 18, 2010, her irritable bowel syndrome was stable. On July 9, 2010, her irritable bowel syndrome was stable. On July 16, 2010, she was referred to a gastroenterologist but does not appear to have ever gone. On August 6, 2010, she said she was doing well. On August 30, 2010, her symptoms were all stable. On September 29, 2010, her irritable bowel syndrome was stable. Because a severe impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms, and because plaintiff's statement of symptoms was properly found not credible in any event, plaintiff's argument on this basis fails.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's irritable bowel syndrome is not a severe impairment.

## VIII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because the ALJ "failed to cite any other evidence [besides the letter terminating treatment due to non-compliance] from [plaintiff's] treating physician. This is problematic as Dr. Hiemstra's treatment notes are probative and suggest that [plaintiff] is not capable of light work." Plaintiff also argues that the ALJ should have ordered a consultative exam because the record contained no opinion from a physician that addressed plaintiff's limitations from her impairments.

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The regulations establish that it is plaintiff's responsibility to provide medical evidence to show that she is disabled. 20 C.F.R. § 416.912; Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) ("At the very least, the claimant's failure to provide medical evidence with this information should not be held against the ALJ when there is medical evidence that supports the ALJ's decision.").

33

If plaintiff wished to obtain a medical opinion regarding her physical residual functional capacity for consideration in connection with her claim, she could have done so. Moreover, the duty to develop the record does not require the ALJ to order a consultative examination in an effort to obtain medical evidence to support a claimant's allegations of disabling limitations. Indeed, an ALJ is required to order consultative medical examinations only when the evidence as a whole is not sufficient to support a decision on a claim. 20 C.F.R. § 416.919a(b); Tellez v. Barnhart, 403 F.3d 953, 956-957 (8th Cir. 2005) ("[The claimant] contends that the ALJ did not 'fully and fairly develop the record' concerning her limitations and that if the 'ALJ did not believe that the professional opinions available . . . were sufficient to allow him to form an opinion, he should have further developed the record.' However, there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence."); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").

In this case the ALJ had sufficient evidence in the record before him to determine whether plaintiff was disabled. In assessing plaintiff's residual functional capacity, the ALJ was not required to rely entirely on any particular physician's opinion, and the ALJ's decision is not defective simply because there was no opinion evidence from a treating or examining physician regarding plaintiff's residual functional capacity. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011); Steed v. Astrue, 524 F.3d 872, 875-876 (8th Cir. 2008) (substantial evidence supported ALJ's conclusion that the claimant had the residual functional capacity to perform light work, where medical records indicated that she suffered only mild degenerative changes in her back condition, even though the medical evidence was "'silent' with regard to work-related restrictions such as the length of time she can sit, stand and walk and the amount

34

of weight [the claimant] can carry"). The ALJ in this case was not required to order a consultative medical examination regarding plaintiff's residual functional capacity.

While medical impairments, including pain, may be disabling if they preclude a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability. Perkins v. Astrue, 648 F.3d 892, 903 (8th Cir. 2011). Plaintiff's argument that Dr. Hiemstra's records, had they been considered by the ALJ, would have resulted in a more restrictive residual functional capacity assessment is without merit. Plaintiff argues that "[b]ecause the ALJ never addressed Dr. Hiemstra's medical records, it is impossible to know how he reconciled the abnormal physical examinations documented by Dr. Hiemstra with a finding that Mayfield is capable of performing light work." However, plaintiff does not specify what functions the ALJ found plaintiff could perform that are inconsistent with Dr. Hiemstra's records. Further, I note that plaintiff's description of Dr. Hiemstra's examinations as "abnormal" is not entirely accurate.

Plaintiff saw Dr. Hiemstra on December 14, 2009, to establish care. Her exam was normal except "mild" pain to palpation and trigger points. She returned on December 30, 2009, with symptoms of bronchitis. She returned again on January 20, 2010, and had a normal exam except trigger points. On February 2, 2010, her exam was normal except trigger points. On February 22, 2010, her exam was normal except trigger points. On March 11, 2010, her exam was normal except trigger points. On April 1, 2010, she had normal gait and range of motion in her neck and extremities. She had pain and decreased range of motion in her lumbosacral area. Despite that, no changes were made to her medications. Less than a month later, on April 26, 2010, plaintiff's exam was normal except trigger points. On May 21, 2010, plaintiff's condition was unchanged. On July 9, 2010, her condition was unchanged. On July 16, 2010, plaintiff complained of constipation and diarrhea and requested Demerol.

35

She got instead a referral to a gastroenterologist, but she did not go. On August 6, 2010, her exam was normal except trigger points. On August 30, 2010, her exam was normal. On September 29, 2010, her exam was normal. On October 22, 2010, her treatment with Dr. Hiemstra was terminated due to non-compliance. I fail to see what in these records supports a finding that plaintiff could not perform light exertional work.

Plaintiff argues that the ALJ erred in failing to provide any limitations associated with shoulder bursitis despite having found that shoulder bursitis is a severe impairment. Simply put, there is not sufficient evidence in the record to support a finding that plaintiff's shoulder impairment is severe. The only mention of plaintiff's shoulder anywhere in the medical records appears during a visit to Dr. Hayes on June 22, 2009, when plaintiff was seen for a routine follow-up to monitor her use of Percocet. She relayed that she had developed bursitis in her right shoulder that was limiting her ability to sleep on her right side. Dr. Hayes noted that plaintiff's right shoulder was tender to abduction. Dr. Hayes diagnosed bursitis in the shoulder and offered an injection of Depo-Medrol (a steroid), but plaintiff declined, saying she was "not that miserable." Dr. Hays encouraged exercise "as always." There is simply no basis for a finding that plaintiff has a severe shoulder impairment. Therefore, if the ALJ committed any error here, it was in finding that plaintiff's shoulder impairment is severe, not in failing to place any limitations on plaintiff's residual functional capacity assessment based on her shoulder condition.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                              /s/ Robert E. Larsen
                              ROBERT E. LARSEN
                              United States Magistrate Judge

Kansas City, Missouri
November 26, 2012

Case 6:11-cv-03412-REL   Document 17   Filed 11/26/12   Page 37 of 37